**DAVID TOLLNER, ESQ (SBN # 138315)**
**JAMES SIBLEY, ESQ (SBN# 1508330**
**SARAH FAIRCHILD, ESQ (SBN #2384690**
**TOLLNER LAW OFFICES**
1550 THE ALAMEDA, SUITE 211
SAN JOSE, CA 95126
TELEPHONE:     (408) 286-3081
FACSIMILE:      (408) 689-1002
davidtollner@gmail.com

ATTORNEYS FOR PLAINTIFFS
M.F.., a Minor by and through his Parent
and Guardian ad Litem, et al.

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| M.F. a minor, by and through his Parent and Guardian, at Litem, Stephanie FARRAJ<br><br>         Plaintiff(s)s,<br><br>    vs.<br><br>HAYWARD UNIFIED SCHOOL DISTRICT, SENECA FAMILY OF AGENCIES and individuals Eydie Dalton-Sausedo, Tammy Watson, Charmaine Wood, Jonathan Lyon, Edward Dorsey, Itoco Garcia, Matthew Clark, Miriam Galavin Defendant(s).; and DOES 1-50, inclusive<br><br>         Defendants. | Case No.: TBA<br><br>**COMPLAINT FOR DAMAGES**<br><br>1. Violation of § 504 Rehabilitation Act of 1973<br>2. Violation of Title II of the Americans with Disabilities Act<br>3. Violation of Civil Rights Act of 1983<br>4. Violation of 42 U.S.C. § 1983<br>5. Negligence<br>6. Negligent Supervision<br>7. IIED<br>8. NIED<br>9. Violation of UNRUH Civil Rights Act<br>10. Violation of California Ed. Code. § 49001<br>11. Battery<br>12. Assault<br>JURY TRIAL DEMANDED |

Plaintiff's M.F., a minor by and through his parents and guardian ad litem Stephanie Farraj and Magdy Farraj, allege as follows:

### THE PARTIES

1.      M.F. was at all times relevant to this complaint a very young minor, and a student with a disability.  He is protected under Section 504 of the Rehabilitation Act, the Americans

with Disabilities Act and state and federal laws as a disabled individual.  M.F. is an American citizen of Palestinian heritage.

2.     M.F., now nine years old, enjoys hands-on activities and sports. He has had longstanding and severe issues with regulating his attention, emotions and behavior.  He has trouble understanding social situations and is highly anxious and has shown signs of depression since preschool. M.F. also has severe learning disabilities that cause him significant frustration. He has been subjected to more than one hundred traumatic physical restraints, which have contributed to anger and anxiety in the school setting.

3.     Stephanie and Magdy Farraj are parents of a young child, M.F., born with and suffering from multiple permanent disabilities. These disabilities include Attention Deficit Hyperactive Disorder (ADHD), Mood Dysregulation Disorder, and Specific Learning Disorder.

4.     Defendant HAYWARD UNIFIED SCHOOL DISTRICT (HUSD) is a local state entity with the responsibility to adhere to all local state and federal mandates applicable to students with disabilities including but not limited to section 504 of the Rehabilitation Act of 1973.

5.     SENECA FAMILY OF AGENCIES (SENECA) has been contracted by HUSD to provide educational and therapeutic services to M.F.

6.     Tammy Watson, employee HUSD.

7.     Eydie Dalton Saucedo, employee at HUSD.

8.     Charmaine Wood, employee at HUSD

9.     Johnathan Lyon, employee at HUSD

10.     Edward Dorsey, employee at HUSD

11.     Itoco Garcia employee at HUSD

12.     Matthew Clark employee at HUSD

13.     Plaintiff does not know Miriam Galavin's employer or position at this time.

///

///

///

**JURISDICTION**

16.     This Court has subject matter jurisdiction over this action pursuant to 29 U.S.C. § 794, et seq., for claims arising under Section 504 of the Rehabilitation Act of 1973 (section 504) and 28 U.S.C. §§ 1331 for claims arising under the American with Disabilities Act of 1990 (ADA) and 42 U.S.C. 1983 for claims arising under the Civil Rights Act of 1871 (1983).

17.     To the extent required by law, Plaintiff(s) has exhausted administrative remedies under the Individual with Disabilities in Education Act (IDEA) and/or such exhaustion would be futile, inadequate or unavailable.

18.     Plaintiff(s) filed multiple Government Tort Claims with HUSD including on September 25, 2015 and April 26, 2016.

**VENUE**

19.     Pursuant to 28 U.S.C. §1391 venue is proper in the district in which this Complaint is filed, which is the judicial district in which the claims have been arisen.

20.     All Acts and omissions occurred on properties owned and/or contracted by or associated with HUSD and/or SENECA.

**GENERAL ALLEGATIONS**

21.     M.F. is a playful and friendly boy with behavioral challenges directly relating to his disabilities. His disabilities impair his ability to appreciate and understand the perspectives, emotions, and motivations of others.  He can be impulsive and appear easily frustrated or uncooperative.

22.     In October of 2010, when he was three years old, M.F. was evaluated by defendant HUSD.  He qualified for special education services with the eligibility category of Emotional Disturbance.[1]

23.     Subsequently, M.F. was placed in HUSD's care and HUSD had a duty to provide appropriate and reasonable care to M.F. while he attended programs at their direction.

---

[1] M.F. was found eligible under the Individual with Disabilities in Education Act (IDEA) to receive a free and appropriate public education ("FAPE") pursuant to 20 U.S.C. 1400 et seq.

24.     HUSD, having evaluated M.F. and found him eligible for federal entitlements had a duty to ensure that M.F.'s rights as a student with a disability were respected and entitlements received.

25.     HUSD, on notice of his special needs, failed to act reasonably, intentionally and negligently discriminated against, and harmed M.F. by failing to provide him with a safe learning environment, reasonable and meaningful behavioral interventions, allowed him to be educated in a hostile school environment, and HUSD failed to intervene when he was physically harmed, restrained, and maliciously injured.

26.     HUSD placed M.F. in Building Blocks Therapeutic School in Oakland, a non-public school run by SENECA Center. M.F. continued in the program for kindergarten.

Kindergarten in HUSD

27.     During kindergarten, M.F. was grabbed, shoved and inappropriately physically restrained on at least 42 occasions by employees or agents of HUSD, including employees and agents of SENECA.

28.     As a result of negligently using, or allowing the use of inappropriate and unlawful physical restraints on a regular basis, and because HUSD failed to effectively address his needs, M.F. was harmed physically and emotionally.

29.     HUSD was on notice that SENECA was abusive in its employment of dangerous restraints, yet failed to intervene on behalf of students and change their placement.

30.     HUSD and SENECA would not have permitted ongoing and ineffective use of restraints if M.F. was not disabled. HUSD and SENECA and all defendants authorized, employed, and otherwise permitted the use of ineffective treatments (damaging physical restraints) on an ongoing and continuous basis only because M.F. was a disabled individual. Further, because of the intentional discrimination he faced and the negligence he suffered, M.F. did not develop the skills he required to make behavioral progress.

///

///

///

PLAINTIFF'S COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1      First Grade Year At Least 47 Episodes of Physical Restraint and/or Seclusion

2          31.    M.F. continued at Building Blocks (placed at the SENECA program under the

3  auspices of and through HUSD) for his first grade year.  During this time, M.F. suffered harm

4  and regression.

5          32.    He was restrained daily on the bus with a harness, rather than providing

6  appropriate staff to supervise him. This caused him emotional distress, humiliation, fear and

7  anxiety.

8          33.    The inappropriate, unreasonable, harmful and constant grabbing, shoving, holding

9  and restraining of M.F. resulted in M.F.'s condition being exacerbated. By October of first grade,

10  M.F. was reported to be "out of control" 24/7.  Mrs. Farraj reported that M.F. had started to use

11  foul language and curse at home as a result of copying his peers at school.  An October report

12  indicated that the school staff reported M.F. had begun "to exhibit more disruptive, defiant, and

13  self-destructive behavior."

14          34.    The District did not consider a one-to-one aide and negligently and intentionally

15  failed to intervene appropriately.

16          35.    At all times herein, Mr. and Mrs. Farraj witnessed the harm done to their son and

17  suffered emotional distress as a result.

18          36.    HUSD and SENECA would not have permitted ongoing and ineffective use of

19  restraints if M.F. was not disabled. HUSD and SENECA and all defendants authorized,

20  employed and otherwise permitted the use of ineffective treatment (damaging physical restraints)

21  on an ongoing and continuous basis only because M.F. was a disabled individual.

22          37.    M.F.'s triennial IEP[2] was convened on October 31, 2013.  At this meeting, the

23  staff "observed a regression in M.F.'s ability to tolerate and process emotions," noting he can

24  become "reckless and assaultive" when emotions overwhelmed him.  When trying to express his

25  wants and needs, M.F. at times "will become non-verbal and during others will be verbally

26

27

28  _____
[2] Individualized Education Plan meeting pursuant to 20 U.S.C. 1400 et seq.

1    aggressive and use curse words."  This demonstrated an absence of any meaningful progress and

2    negligence by HUSD.

3        38.    The IEP contained a Behavior Support Plan to address M.F.'s "Serious Behavior."

4    The Serious Behaviors to be targeted were M.F.'s self-harm (hitting head against the wall and

5    hitting himself in the face) and assaultive behaviors (hitting, kicking).  These were the same

6    behaviors, only more advanced, that M.F. had been struggling with for years, showing no

7    progress in the area of behavior.  In spite of the ineffective behavior plan, and this obvious

8    evidence that the interventions were not effective, M.F. continued to be regularly restrained.  He

9    was unreasonably restrained *at least* 47 times over the course of this school year, causing fear,

10   anxiety, humiliation and emotional distress.

11       <u>Transition to Second Grade</u>

12       39.    At a May 5, 2014 IEP team meeting, the team discussed M.F.'s graduation from

13   Building Blocks and transition to second grade.  The team expressed significant concern with

14   M.F.'s ability to transition to second grade class.  Unfortunately, although HUSD was on notice

15   about how intense any change would be for M.F., and that his most serious behaviors were

16   triggered by transition, it failed to reasonably transition M.F. appropriately to his new school for

17   the second grade.

18       40.    M.F. was not given meaningful or reasonable transition supports because he was a

19   student with a severe disability.

20       41.    For M.F.'s second grade year, the District unilaterally placed him at Bowman

21   Elementary School ("Bowman").  Bowman is another District elementary school with a

22   SENECA-run Therapeutic Special Day Class.  No reasonable services were put in place to

23   support M.F. to reduce his behaviors during the transition or support him as he faced a new

24   classroom.

25   ///

26   ///

27   ///

28   ///

<u>HUSD's Negligence and Actions Led to a Tragic Second Grade Year (2014 – 2015) at</u>
<u>Bowman</u>

42.     M.F.'s experience at Bowman was fraught with harm and regression. Unsupported, fearful, anxious about school, M.F.'s disability-related behaviors escalated. HUSD negligently and intentionally failed to intervene.

43.     SENECA, HUSD, and named defendants intentionally failed to honor M.F.'s federal rights to have appropriate interventions and a safe learning environment.

44.     HUSD knowingly permitted employees and agents to assault M.F. regularly. HUSD was aware that SENECA, its agent, was utilizing excessive and harmful restraints but failed to intervene on M.F.'s behalf because M.F. has a severe disability.

45.     HUSD failed to investigate the harms that were committed against M.F. because he was a minor of Palestinian decent who had a severe disability.

46.     This caused M.F. harm and caused his family emotional distress.

47.     On eight occasions from August 1, 2014 to September 15, 2015, Bowman wrote eight Emergency Incident Reports ("Incident Reports") for behaviors ranging from throwing books, assaultive behavior towards peers and staff (hitting, kicking, threatening with a stick), persistent non-compliance, screaming, destruction of property (throwing backpack and toys, taking toys, smashing, etc.), running around campus, running away, climbing fences and bookshelves, recklessness, biting. On each one of these occasions, instead of helping M.F. appropriately and in a reasonable manner, M.F. was grabbed, pushed, shoved, held, manipulated in physical restraints, and was very frequently excluded from his educational environment (sent home).

48.     M.F.'s drastic behavioral regression, as a result of being placed at Bowman, was devastating to M.F.'s parents. The parents continued to suffer great emotional anxiety and sadness as they witnessed their son's continued decline.

49.     Rather than appropriately support M.F., the District negligently and intentionally allowed him to be grabbed, shoved, pulled and harmed repeatedly, and allowed him to regress emotionally and denied him access to his education.

50.     This harm continued and escalated.  Over the next month, Incident Reports describe grabbing, holding, and physically restraining M.F. on at least 11 more occasions.  On each of these occasions, M.F. was placed in different types of restraints.  The District's actions and inactions were intentional and negligent and caused an exacerbation of M.F.'s condition.

51.     By October 29, 2014, the date of M.F.'s annual IEP, M.F. was miserable, suffering from depression and anxiety.  He had written his peers multiple letters expressing how sad he was.  He had regressed in every area and was being regularly restrained.  Instead of intensifying the services to address the unequivocal pervasive regression, the District did not even consider increasing supports or services, and failed to consider alternative placements.  Defendant's intentional deprivation of M.F.'s rights caused M.F. great harm, anxiety, shame, humiliation, and an exacerbation of his condition. He was being harmed emotionally, socially and behaviorally.

Notice of Breach of Duty

52.     An IEP meeting was held December 3, 2014 in which Mrs. Farraj expressed concerns over the staff's response to her son's negative behaviors.  She continued to question the team's assertion that regular restraint was needed to properly aid her child.  She was concerned about his persistent exclusions from school (being sent home regularly) as she felt he was being refused access to his education on the basis of his disability.  Regardless of being on notice of the discriminatory treatment M.F. was facing, the District failed to change M.F.'s treatment.

53.     HUSD's failure to investigate the harms that were befalling M.F. and their failure to intervene on his behalf was negligent and discriminatory.  Defendant's failed to intervene because M.F. was a minor of Palestinian decent who was severely disabled.

54.     By February 2015, the District improperly and unlawfully restrained M.F. 13 more times.

55.     Throughout this period, M.F.'s school called M.F.'s mother repeatedly, asking that he be removed from his educational environment and instead kept at home.  M.F. and his family were in a never-ending nightmare facilitated by the District's negligent and intentional failure to meet M.F.'s unique needs.

56.     On February 11, 2015, the District convened an IEP amendment meeting to review and revise the BIP and discuss the use of restraints against M.F., which, by this time, had been going on for four years.  Again, unreasonably and inexplicably, no functional behavior assessment was conducted.

57.     At the February 11, 2015 meeting, the District discussed how its employees, agents and staff were using restraints and admitted that in some instances  (such as an incident which took place January 29, 2015) M.F. was grabbed and held in a physical restraint  because there were no rooms available for calming down.  They admitted to restraining M.F. not because it was appropriate, but because HUSD did not have appropriate space.

58.     A high rate of restraint is evidence of treatment failure. Further, "there continues to be no evidence that using restrain or seclusion is effective in reducing the occurrence of the problem behaviors that frequently precipitate the use of such techniques". [3]

59.     Being in restraints is a very dehumanizing, demoralizing, depressing experience and the longer it goes on, the more frustrated and provoked an individual feels.

60.     M.F., having a history of associating high rates of restraint during his entire school career, was demoralized and depressed and used to being subjected to dehumanizing treatment.

61.     Defendants failed both in not adequately training M.F.'s staff in the use of restraints and in not requiring prior approval or, where necessary, supervision after the fact by a qualified professional. Defendants' negligently and/or intentionally failed to evaluate the system by which they were intervening with M.F. to find a safer more effective and respectful system of treatment.

62.     The use of restraint or seclusion created a significant risk for M.F. as it does for all children, and it re-traumatized M.F. each time it was employed, as he had a history of trauma, loss of dignity, and other psychological harms.

---

[3]   U.S.   Department   of   Education,   *Restrain   and   Seclusion:   Resource   Document*,   3, https://www2.ed.gov/policy/seclusion/restraints-and-seclusion-resources.pdf (May 2012)

63.     During the February 11, 2015 meeting, Ms. Farraj expressed serious concern over M.F.'s school day behaviors.  She reported, again, these behaviors did not occur at home.  She had concern that he was not making any academic progress.  She told the team if M.F.'s negative behaviors did not ameliorate she would like the team to offer alternative placements.

64.     Unfortunately, after the February 11, 2015 meeting there was further harm and regression.  Over the next month and one half, M.F. was restrained by school staff at least six more times.  He was openly discriminated against, and treated in a disrespectful manner by staff, who were accustom to intentionally depriving him of his rights.

65.     For instance, on February 25, 2015 a school employee (Mr. Lyons) harassed and verbally abused M.F. by taunting and grabbing him.  Mr. Lyons was observed by an aide to approach M.F. and hold, just out of M.F.'s reach, a placard that M.F. was using.  Mr. Lyon's intentionally provoked M.F. by pulling the placard further and further away and causing M.F. to erupt into a violent tantrum.  Mr. Lyons discriminated against M.F. on the basis of his disability and punished him on the basis of his disability and his national heritage.

66.     The aid who witnessed this event stated that M.F. "did not appear to be a danger to himself or others at this time." The aid described Mr. Lyon's behavior toward M.F. as "somewhat goading."

67.     The school reported this incident as child abuse to the police department.  This was just another painful and harmful incident for this young man while in the care of HUSD.  Mrs. Farraj caught wind of this abuse, but was told it was private.

68.     M.F.'s IEP team reconvened on March 11 to "debrief" in regard to restraints used March 3, 6 and 10, 2015.

69.     At this meeting, once again, Mrs. Farraj told the team of her grave concern for her son's safety on campus.  The District pledged to try new staffing, including bringing in a new behavior intervention specialist from Seneca to support staff in improving crisis intervention.  Although HUSD promised to provide a safer and more reasonable response to M.F.'s disability, they failed to do so. HUSD continued to be negligent in its failure to effectively or appropriately

1    intervene to increase supports and services and stop the abuse he was suffering regularly at

2    school.

3            70.    On March 27, 2015, the team met again to debrief further restraints (March 19

4    and 24, 2015).  Nothing was offered.

5            71.    On the very last day of school, HUSD negligently allowed M.F. to run away from

6    campus.  He had to be chased down a busy street.  While gone, M.F. had found a beer bottle and

7    covered himself in it.  Mr. Farraj picked up his small son from school that day and he was

8    covered in beer.  Both parents were terrified for their son's safety.

9            The Thirty-Ninth Episode of Restraint by A District Employee

10           72.    On June 16, 2015, the second day of M.F.'s summer school program at Southgate

11   (a District school), the disrespect and de-humanizing treatment of M.F. continued.  M.F. was

12   grabbed inappropriately and physically and verbally abused by a District employee, Eydie

13   Dalton-Sausedo, who picked him out and slammed him against a wall to yell at him using racial

14   epithets.  Ms. Dalton-Sausedo discriminated against M.F. on the basis of his disability and his

15   national heritage.  Ms. Dalton Sausedo provoked M.F., harassed him and humiliated him. She

16   even stuck her tongue out at him and yelled angry words with him; he was just an eight-year-old

17   boy.  This further harmed M.F. and has contributed to his significant anxiety.  This event was

18   particularly harmful and distressing to M.F. and his parents. Ms. Dalton-Sausedo continues to

19   work at HUSD and HUSD failed to appropriately investigate this incident.

20           73.    For his third grade year, M.F. was directed to start at another school run by

21   HUSD, Cherryland.  Plaintiff was informed and does believe that the Seneca Program at

22   Bowman was shut down after M.F. attended there.

23           Unsafe School Transportation

24           74.    M.F. began school at Cherryland Elementary on August 26, 2015.  M.F.'s parents

25   were told by District personnel that M.F. would be on the transportation list and be picked up for

26   school.  The transportation company regularly arrived at 8:40 to pick M.F. up from school, thirty

27   minutes after school had already begun.  The District negligently allowed him to miss school due

28   to late transportation.

1    75.    HUSD failed to ensure that M.F. was safely transported to school and paired him

2  on the transport with other children who were known to provoke and harm other children. For

3  instance, on August 31st, three other boys in the transport were taunting and bullying M.F.

4  calling him names and telling M.F. "your mama is a bitch."  The boys started hitting each other

5  in the car.  M.F.'s father observed the altercation and stated that when they hit each other in the

6  vehicle, the driver (HUSD agent) did nothing.  M.F.'s father observed this incident, as he

7  emerged from the family home when he heard M.F. screaming.

8    76.    Another dangerous incident related to transport occurred on September 22, 2015.

9  The District failed to notify transportation that school would be getting out early.  M.F. was at

10  school with no one there to pick him up. Issues with transportation continued throughout the

11  2015-2016 school year.

12    <u>Continued Restraints at Cherryland Elementary</u>

13    77.    In just the first three weeks of the new school year, M.F. was inappropriately

14  restrained and abused on multiple occasions.

15    78.    For example, on September 9, 2015, M.F. was restrained three times.  M.F. was

16  grabbed inappropriately and abused by District employees, Mr. Itoco Garcia and Mr. Mathew

17  Clark.

18    79.    M.F. came home from school saying that he had been hurt and was in pain. He

19  stated "Mom it hurt really badly and I hate when people hold me down."  M.F. had multiple

20  bruises and scratches and was too scared to go back to school.

21    80.    The following day, September 10, 2015, Mr. Clark called M.F. parents asking

22  why M.F. was not at school and notifying parents that the incident report was ready to be picked

23  up.  M.F.'s mother went to Cherryland to pick up the incident report and met with Mr. Clark to

24  discuss the incident.  Mr. Clark admitted he felt they were "hard" on him during the restraints

25  and he knew that M.F. would be "in pain".

26    81.    The District continued to intentionally, negligently, and recklessly harm M.F.

27  causing him to suffer further physical, emotional and psychological harm.

28

82.     At school, M.F. continued to be restrained. He once again suffered great stress, anxiety, and depression.  HUSD was on notice that M.F. was vulnerable and had trauma from previous years of restraints at the hands of its own employees.

83.     Despite these events and being on full notice of the physical harm M.F. was enduring, HUSD intentionally and/or negligently failed to provide appropriate staff and supervision to ensure that M.F. could be educated reasonably and in a safe environment.  During this time HUSD failed to provide M.F. a one to one aide with appropriate behavioral knowledge to help him access his education. As a result M.F. was denied meaningful access to his education.

January 15, 2016 Incident

84.     On January 15, 2016, M.F. was abused by yet another HUSD employee. M.F. became upset because the class was instructed to do classwork, which was different than the usual Friday schedule. His frustration, as it had in the past, escalated and M.F. left the room to take a break outside. Mr. Thomas, a classroom paraprofessional, accompanied him outside. Mr. Thomas, negligently lost sight of M.F. and M.F. ended up on the other side of the school campus unassisted. M.F. was allowed to endanger himself by climbing over a chain linked fence bordering the perimeter of the school. This area was restricted and was full of broken and dangerous items.

85.     M.F. was then attacked by a Cherryland Elementary teacher, Mr. Dorsey, who negligently and with excessive force threw M.F. back over the fence. This attack was witnessed by a bystander.

86.     At approximately 10:30 am, the police were called by Brenda Banchieri (she called from the Bay Point Nursing Center located next to Cherryland Elementary). She reported that two adult males were struggling with a student on school grounds. She stated it had appeared that one of the males had thrown the student over a fence and the student was then held down on the blacktop of the school.

87.     Ms. Banchieri met with reporting School Resource Officer, Jose Najera. She explained that Mr. Thomas was talking to M.F. through the fence and she did not see how or

know how the student got on the other side of the fence. Then Mr. Dorsey, a kindergarten teacher, exited a backroom of the school and walked directly towards the area where M.F. was located. She stated that Mr. Dorsey appeared angry as he did not hesitate to climb directly over the gate into the fenced off area.

88.     Mr. Dorsey then grabbed M.F. and threw him over the fence without making any other attempt to get him out of the area. It was later learned that, Mr. Thomas notified Mr. Dorsey that he had a key to the fence so he could open the gate, but Mr. Dorsey chose to attack M.F. and throw M.F.'s body instead, intentionally harming M.F.

89.     Mr. Dorsey intentionally and negligently threw Mohammed over the fence even though Mr. Thomas had notified him that he had the key to open it.

90.     Ms. Banchieri further witnessed that M.F. did not land on his feet after being tossed over the chain-link gate.

91.     Once Mr. Dorsey got back over the fence, he unlawfully and painfully restrained M.F. intentionally inflicting harm on him. Multiple witnesses reported that M.F. was pinned to the ground, crying, and screaming. Mr. Dorsey, without regard for M.F.'s well-being, restrained Mohammed, holding him down by his neck on the ground until Cherryland Elementary principal, Mr. Garcia, arrived and took over.

92.     M.F. suffered swelling of his neck, abrasions and scratches on his arms, back and neck. His parents took him to the emergency room immediately following the incident where swelling and abrasions were identified.  To this day M.F. suffers from headaches resulting from the incident.

93.     This experience caused M.F. very significant emotional distress.

94.     On February 26, 2016, Parents followed up on M.F.'s continued headaches and brought him to be examined by the Neurology Department at Children's Hospital and Research Center of Oakland. He was diagnosed with headaches due to trauma.

95.     In addition to the physical harm, M.F. presents symptoms of emotional distress and trauma from the abuses he suffered at school. He has nightmares nightly of him being

1    restrained. Parents recently witnessed M.F. sleep walking and he looked as though he was trying

2    to get someone off of him and fighting them off.

3        96.    Mr. Dorsey remains a teacher at Cherryland Elementary within HUSD after this

4    incident and HUSD failed to discipline Mr. Dorsey or terminated his employment. Instead

5    Mohammad has to attend a campus where he can be exposed to his abuser.

6        97.    The negligent and intentional repeated, consistent, and harmful restraining is due

7    to discrimination on the basis of M.F.'s religion and national heritage and has been permitted to

8    continue on the basis of his disability.  The abusive use of restraints and the failure to provide

9    positive and appropriate supports and services has caused M.F. and his family great harm.

10   HUSD's negligence has only served to deny M.F. access to his education and has failed to

11   provide meaningful access to a safe learning environment and has caused great physical and

12   emotional harm.

13       98.    Pursuant to California Education Code §44807 defendants at all times had general

14   duty to supervise the students in their care to ensure safety.  Under Cal Education Code §49000,

15   defendants are prohibited from utilizing corporal punishment of students entrusted to them.

16   Additionally, California Education Code §56521.1(b) severely restricts the use of restraints and

17   protects students with disabilities from the use of aversive behavioral modifications.[4]

18       99.    Pursuant to California Penal Code §11165.4 defendants are required to report

19   incidents of abuse, unlawful corporal punishment or injury suffered by students in their care.

20

21

22

23

24

25

---

26   [4] Many of the causes of action in this complaint arise of HUSD employees or its contractor's use of restraints or holds on M.F.  The danger of restraints is well documented.  The Government Accountability Office (GAO)

27   published a report entitled Seclusions and Restraints: Selected Cases of Death and Abuse at Public and Private Schools and Treatment Centers. The report identified children with disabilities as being particularly likely to suffer abuse through use of restraints ad found evidence of harm being inflicted by the use of restraints by untrained

28   staff.

**FIRST CAUSE OF ACTION**

**VIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1973**

**(29 U.S.C. § 794.)**

**(AS AGAINST ALL DEFENDANTS)**

100.     Plaintiff(s) hereby incorporates by reference each and every foregoing allegation as though set forth fully herein.

101.     Plaintiff(s) is entitled to the protections of section 504 of the Rehabilitation Act of 1973 as a parent and advocate for an individual with a disability.

102.     Plaintiff(s) are informed and believe and therefore allege HUSD is and has been at all relevant times the recipient of federal financial assistance.

103.     Section 504 provides: "No otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance...." 29 U.S.C. § 794(a).

104.     The U.S. Department of Education's § 504 regulations require recipients of federal funds to "provide a free appropriate public education to each qualified handicapped person," and define "appropriate education" as "regular or special education and related aids and services that . . . are designed to meet individual educational needs of handicapped persons as adequately as the needs of non-handicapped persons are met." 34 C.F.R. § 104.33 (a)(b)

105.     Section 504 allows students who are denied meaningful access to state educational benefits to seek "the full panoply of remedies, including equitable relief and [compensatory] damages." Mark H. v. Lemahieu, 513 F.3d 922, 938 (9th Cir. 2008). A school district that fails to provide meaningful access to public education to disabled students is thereby liable in damages. Mark H. v. Hamamoto, 620 F.3d 1090, 1097 (9th Cir. 2010)

106.     M.F. was both excluded from participation in, and denied the benefits of HUSD services, programs, or activities when they restrained him, failed to provide meaningful interventions, failed to investigate or stop the abuses he was enduring, humiliated him, and excluded him solely because of manifestations of his disability.

107.   By their actions or inactions in denying  M.F. equal access to educational services and by subjecting M.F. to a hostile educational environment the defendants violated Platiniff M.F.'s rights under § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 784, and the regulations promulgated thereunder.

108.   In doing the acts as hereinabove alleged, Defendants harmed Plaintiff(s) resulting in damages including special and general damages according to proof.

109.   As a direct and proximate result of the acts and omissions of Defendants, and each of them, as hereinabove alleged, Plaintiff(s) has suffered severe and permanent special and general damages, including, but not limited to, emotional injury, including post-traumatic stress disorder, extreme anxiety, humiliation, embarrassment, and ridicule.

110.   The full extent of Plaintiff(s)'s injuries and damages are not known at this time.

111.   Under 29 U.S.C. § 794a(b), this Court may award reasonable attorney's fees to a prevailing party who brings a private action under § 504. An award of attorney's fees to a prevailing party under § 504 is also authorized by 42 U.S.C. § 1988(b).

112.   Plaintiff(s) seeks a finding by this Court that he is prevailing party in this case, entitled to reasonable attorney's fees, including litigation expenses and costs, related to their claim.

113.   HUSD is vicariously liable for the actions or inactions of its employees as well as through their contracts with SENECA who were deliberately indifferent to the abuse committed by Mr. Dorsey, its other employees, and SENECA.

### SECOND CAUSE OF ACTION

### VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT

### (42 U.S.C. § 12131 et seq)

### (AS AGAINST ALL DEFENDANTS)

114.   Plaintiff(s) hereby incorporates by reference each and every foregoing allegation as though set forth fully herein.

115.   Plaintiff(s) were entitled to the protections of the "Public Services" provision of Title II of the Americans with Disabilities Act of 1990. Title II, Subpart A prohibits

1   discrimination by any "public entity," including any state or local government, as defined by 42

2   USC § 12131, section 201 of the ADA.

3       116.    The ADA is a comprehensive civil rights and equal opportunity statute.   The

4   Congressional findings contained in the ADA state that "discrimination against individuals with

5   disabilities persists in such critical areas as . . . education. . . ."   42 U.S.C. § 12101(a)(3).  The

6   broad remedial purposes of the ADA include "provid[ing] a clear and comprehensive national

7   mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. §

8   12101(b)(1).  The ADA requires that "no qualified individual with a disability shall, by reason

9   of such disability, be excluded from participation in or be denied the benefits of the services,

10  programs, or activities of a public entity, or be subjected to discrimination by any such entity."

11  42 U.S.C. § 12132.

12      117.    It is unlawful for a person or entity to discriminate against any individual because

13  that individual has opposed any act or practice that he or she reasonably believes to be unlawful

14  under the ADA.

15      118.    A student who is subjected to a hostile educational environment is deprived of

16  some of the advantages and privileges of a public education.

17      119.    M.F. is an individual with a disability.

18      120.    M.F. was identified in preschool as being a "child with a disability"[5] pursuant to

19  the Individuals With Disabilities in Education Act ("IDEA") (20 U.S.C. §§1400 et seq.) M.F.

20  currently receives services under the IDEA.

21      121.    M.F. is otherwise qualified to participate in or receive the benefits of HUSD

22  services, programs, or activities.

23      122.    M.F. was discriminated against by District and staff in violation of the Fourth

24  Amendment of the U.S. Constitution; he was unreasonably grabbed, yanked, restrained and

25  painfully held down over the course his school career.

26

27

28  [5] See 20 U.S.C. §1401(3).

123.   M.F. was discriminated against in violation of the Fourteenth Amendment as described below.

124.   HUSD has failed its responsibilities under Title II to provide its services, programs and activities in a full and equal manner to disabled persons as described hereinabove by subjecting plaintiffs to a hostile learning environment. M.F. was both excluded from participation in and denied the benefits of HUSD services, programs, or activities when he was forced to leave school and go home, instead of accessing school classrooms, programs, supports and activities at school.  M.F. was otherwise discriminated against by HUSD services, programs, agents or activities when he was physically abused, humiliated, bullied and kept from receiving appropriate treatment, supports and special education.

125.   M.F. was intentionally denied access to federal entitlements by Defendants.

126.   HUSD further discriminated against M.F. when it failed to investigate and provide recourse for the discrimination and harm M.F. suffered.

127.   A violation of the ADA is, by statutory definition, a violation of both the Unruh Civil Rights Act ("UNRUH") and the California Disabled Persons Act ("DPA"). Cal. Civ. Code §§51(f), 54.1(d).

128.   Plaintiff(s) are not required to prove that the discrimination was intentional when seeking damages for ADA violations under the Unruh Act. Munson v. DelTaco, 46 Cal.4th 661 (2009).

129.   A finding of intentional discrimination or deliberate indifference is required to pursue monetary damages under the ADA and the Rehabilitation Act. Deliberate indifference requires (1) "knowledge that a harm to a federally protected right is substantially likely" and (2) "a failure to act upon that likelihood."

130.   All Defendants and District agents and/or staff were fully aware of the federally protected rights of disabled students under their care.  Acting to thwart M.F. from receiving appropriate entitlements for M.F. as described above intentionally deprived M.F. of their federally protected rights under the Fourth Amendment, Equal Protection Clause and the IDEA (20 U.S.C. 1400 et seq.).

131.    As a direct and proximate result of the Defendants' discrimination, Plaintiff(s) including M.F. have suffered severe and substantial damages.  These damages include physical injury, humiliation, embarrassment, inconvenience, shock, shame, mental and emotional anguish and distress, anxiety, fear and other damages, in an amount to be determined by a jury and the Court.

132.    Plaintiff(s) seeks a finding by this Court that he is prevailing party in this case, entitled to reasonable attorney's fees, including litigation expenses and costs, related to their claim.

### THIRD CAUSE OF ACTION

### VIOLATION OF CIVIL RIGHTS ACT OF 1983

### (VIOLATION OF THE 14th AMENDMENT)

(As Against all Defendants)

133.    Plaintiff(s) hereby incorporates by reference each and every foregoing allegation as though set forth fully herein.

Procedural Due Process

134.    The procedural component of the Due Process Clause provides that certain substantive rights--life, liberty, and *property*--cannot be deprived except pursuant to constitutionally adequate procedures.

135.    A protected property interest is present where an individual has a reasonable expectation of entitlement deriving from existing rules or understandings that stem from an independent source such as state law.

136.    Students have a protected property interest in a public education.

137.    M.F.'s property interest in public education was violated without due process, when he was regularly excluded from his school (sent home) without any investigation or due process.

138.    The District failed to adequately investigate the abuse and legal deprivations suffered by M.F.

///

Substantive Due Process

139.    The substantive component of the Due Process Clause protects individual liberty against certain government actions regardless of the fairness of the procedures used to implement them. Conduct that is arbitrary, or conscience shocking, in a constitutional sense rises to the level of a substantive Due Process violation.

140.    The substantive component of the Due Process Clause protects students against abusive governmental power as exercised by school district employees.

141.    When a school official's conduct is shocking to the conscience and offends the community's sense of fair play and decency, the Due Process Clause is implicated.

142.    When force is used against a student and that force is excessive, or used without justification or for malicious reasons, there is a violation of substantive Due Process.

143.    In determining whether substantive Due Process rights have been violated, there must be inquiry into 1) the need for the governmental action in question, 2) the relationship between the need and the action, 3) the extent of harm inflicted, and 4) whether the action was taken in good faith or for the purpose of causing harm.

144.    There was no need for the school district employees to grab, humiliate, taunt, throw or otherwise physically abuse M.F. There was no legally supported need for the school district staff or administration to deprive M.F. of his rights to access his education.  There was no need for the school district staff or administration to keep M.F. from receiving effective and meaningful treatment, supports or services.  There was no need for the District to fail to investigate M.F.'s deprivations.  There was no legal justification for their actions.

145.    The extent of harm was great.  A small disabled child was physically harmed, traumatized, developed an anxiety disorder, denied federal entitlements, kept from reasonable and necessary treatments for manifestations of his disability.

146.    There was no legal justification for the Defendant's actions. Throwing a child over a fence has no legal justification. Taunting a child for the sole purpose of provoking him and harassing him as no legal justification. Shaking a child and yelling racial epithets has no legal justification.

147.    The intentional discrimination by HUSD, its staff, and agents are shocking to the conscience and amount to substantive Due Process violations.

148.    All Defendants including school staff were fully aware of the federally protected rights of disabled students under their care and the impact upon both the child and their family when those rights are ignored.

149.    Defendants acted maliciously, intentionally, and with indifference when they held, grabbed, shoved, threw, pushed and restrained M.F.

150.    As a direct and proximate result of the Defendants' actions, Plaintiff(s) have suffered severe and substantial damages.  These damages include physical injury, humiliation, embarrassment, inconvenience, shock, shame, mental and emotional anguish and distress, anxiety, fear and other damages, in an amount to be determined by a jury and the Court.

151.    Plaintiff(s) seeks a finding by this Court that he is prevailing party in this case, entitled to reasonable attorney's fees, including litigation expenses and costs, related to their claim.

## FOURTH CAUSE OF ACTION

### Violation of 42 U.S.C. § 1983

### Right to Fourth Amendment Protections

### Plaintiff: M.F.

152.    The foregoing facts and allegations are incorporated as if re-alleged herein.

153.    Title 42 U.S.C. § 1983 provides a cause of action for the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. To state a claim under § 1983, a plaintiff must allege two essential elements: (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a person acting under the color of State law.

154.    A defendant in a § 1983 suit acts under color of state law when he abuses the position given to him by the state

155.    In this matter, Defendants, acting under color of state law, acted intentionally and with callous disregard for M.F.'s clearly established Fourth Amendment Constitutional rights.

1  The Defendants violated M.F.'s right to be free from unreasonable seizures by pulling, holding,
2  seizing, throwing, restraining, grabbing and yanking M.F.

3      156.    The Defendants grabbed and held M.F. and physically restrained him, using non-
4  certified interventions.

5      157.    A seizure violates the Fourth Amendment if it is objectively unreasonable under
6  the circumstances.

7      158.    It was objectively unreasonable for the Defendants to physically accost and harm
8  M.F. a boy with known disabilities who was in their care in order to learn how to manage his
9  disability.

10      159.    Given that Plaintiff is a small child, it was objectively unreasonable for Defendant
11  Mr. Dorsey to:  powerfully "yank" him and throw him over a fence and then hold M.F., an eight
12  year old boy against the ground by his neck causing him pain, fear, humiliation, embarrassment,
13  exacerbation of his disabilities, and persistent headaches for months.

14      160.    The physical harm was intrusive and abusive and completely unjustified.

15      161.    As a direct and proximate result of the Defendants' violations of M.F.'s Fourth
16  Amendment rights, M.F. has suffered severe and substantial damages.  These damages include
17  pain, suffering, physical distress, physical harm, shock, isolation, humiliation, embarrassment,
18  regression, mental and emotional anguish and distress and other damages, in an amount to be
19  determined by a jury and the Court.

20  **FIFTH CLAIM FOR RELIEF**
21  **NEGLIGENCE**
22  **(As against All Defendants)**

23      162.    Plaintiffs incorporate and reallege by reference all the foregoing paragraphs, as if
24  they were fully set forth herein.

25      163.    Defendants owed Plaintiffs a duty to exercise reasonable care in their interactions
26  with them. These Defendants failed to exercise reasonable care in their actions as alleged herein.

27      164.    As a proximate result of Defendants' negligent acts, Plaintiffs have incurred
28  damages as alleged heretofore.

### SIXTH CLAIM FOR RELIEF

### NEGLIGENT SUPERVISION

### (As against all Defendants)

165.    Plaintiffs incorporate and reallege by reference all the foregoing paragraphs, as if they were fully set forth herein.

166.    School personnel Defendants owe students under their supervision a protective duty of ordinary care, for breach of which HUSD is vicariously liable.

167.    School principals and other supervisory employees, to the extent their duties include overseeing the educational environment and the performance of teachers and counselors, owe a duty of care to take reasonable measures to guard students against harassment and abuse from foreseeable sources, including any teachers or counselors they know or have reason to know are prone to such abuse.

168.    As a proximate result of Defendants' negligent supervision of Defendant Mr. Lyons, Ms. Dalton Saucedo, and Mr. Dorsey, Plaintiffs have incurred damages as alleged heretofore.

### SEVENTH CAUSE OF ACTION

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### (AS AGAINST ALL DEFENDANTS)

169.    Plaintiff(s) hereby incorporates by reference each and every foregoing allegation as though set forth fully herein.

170.    To sufficiently plead a claim of intentional infliction of emotional distress ("IIED"), plaintiffs must assert:

(1) Extreme and outrageous conduct with either the intention of, or reckless disregard for, causing emotional distress;

(2) The plaintiff having suffered severe or extreme emotional distress; and

(3) Actual or proximate causation.

///

///

171.   Defendant, Mr. Lyon's, intentional extreme and outrageous conduct, taunting and harassing M.F., which ended up being reported as child abuse was undertaken with the intention of, or reckless disregard for causing emotional distress.

172.   Defendant, Ms. Dalton Saucedo's, extreme and outrageous conduct, picking him out and slamming him against a wall to yell at him using racial epithet, provoking and harassing him.  M.F., harassed him and humiliated him. She even stuck her tongue out at him and yelled angry words with him; he was just an eight-year-old boy.  This conduct was undertaken with the intention of, or reckless disregard for causing emotional distress.

173.   Defendant, Mr. Dorsey's, intentional extreme and outrageous conduct, grabbing and humiliating an eight year old boy, throwing him over a fence and pinning him to the ground was undertaken with the intention of, or reckless disregard for causing emotional distress.

174.   As a result of the extreme and outrageous acts, Plaintiff was caused, and continues to suffer, severe emotional distress.

175.   In harassing, intimidating and abusing as hereinabove alleged, Plaintiff(s)s are informed and believe, and thereon alleges that Defendants, and each of them, acted with the intent of, or with intentional disregard for, the probability of causing Plaintiff(s)'s severe emotional distress.

176.   In doing the acts as hereinabove alleged, Defendants, and each of them, intentionally caused Plaintiff(s) severe emotional distress.

177.   As a direct and proximate result of the intentional conduct of Defendants, and each of them, Plaintiff(s) has sustained severe mental anguish, pain, suffering, and distress.

178.   HUSD after learning about the abuse of its employees continues to employee these individuals and failed to appropriately investigate this incident. HUSD is vicariously liable for the intentional torts of its employees pursuant to Cal. Govn't Code § 815.2

179.   The aforementioned conduct of Defendants, and each of them, constituted intentional infliction of emotional distress with the intention on the part of Defendants of depriving Plaintiff(s) of legal rights or otherwise causing injury, and was despicable conduct that

subjected Plaintiff(s) to cruel hardship in conscious disregard for Plaintiff(s)s' rights, so as to justify an award of exemplary and punitive damages.

## EIGHTH CAUSE OF ACTION

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

### (AS AGAINST ALL DEFENDANTS)

180.    Plaintiff(s) hereby incorporates by reference each and every foregoing allegation as though set forth fully herein.

181.    In harassing, intimidating and physically abusing  as hereinabove alleged, Plaintiff(s)s are informed and believe, and thereon alleges that Defendants, and each of them, acted negligently and recklessly and in disregard for the probability of causing Plaintiff(s)'s severe emotional distress.

182.    Defendants, and each of them, were under a duty to exercise ordinary care to avoid reasonable, foreseeable injury to Plaintiff(s).

183.    Defendants failed to act as reasonable school staff responsible for the management, care and education of students with disabilities and their parents;

184.    Defendants, and each of them, knew, should have known, or could have known through the exercise of reasonable diligence, that Plaintiff(s) would suffer severe emotional distress by virtue of the wrongful conduct of Defendant as hereinabove alleged.

185.    In doing the acts as hereinabove alleged, Defendants, and each of them, negligently and recklessly caused Plaintiff(s) severe emotional distress.

186.    Defendants, and each of them, knew or should have known that their failure to exercise due care in the performance of their respective duties would cause Plaintiff(s)s irreparable harm.

187.    As a direct and proximate result of the negligent conduct of Defendants, and each of them, Plaintiff(s) has sustained severe mental anguish, pain, suffering, and distress.

188.    The aforementioned conduct of Defendants, and each of them, constituted negligent infliction of emotional distress with the intention on the part of Defendants of depriving Plaintiff(s)s of legal rights or otherwise causing injury, and was despicable conduct

1    that subjected Plaintiff(s)s to cruel hardship in conscious disregard for Plaintiff(s)s' rights, so as

2    to justify an award of exemplary and punitive damages

### NINTH CAUSE OF ACTION

### VIOLATION OF UNRUH CIVIL RIGHTS ACT

### (AS AGAINST ALL DEFENDANTS)

189.    The foregoing facts and allegations are incorporated as if re-alleged herein.

190.    California's Unruh Civil Rights provides that an individual may seek to recover damages from "[w]hoever denies, aids, or incites a denial, or makes any discrimination or distinction contrary" to the substantive provisions of the Act.

191.    Civil Code section 52 provides a damage remedy for violations of section 51: "Whoever denies, aids or incites a denial, or makes any discrimination or distinction contrary to section 51 . . . is liable for each and every offense for the actual damages, and any amount that may be determined by a jury . . . up to a maximum of three times the amount of actual damages but in no case less than two hundred fifty dollars . . . and any attorney's fees . . . ." Civ. Code § 52(a).

192.    To prevail on a disability discrimination claim under the Unruh Civil Rights Act, a plaintiff must establish that: (1) Defendants denied the plaintiff the full and equal accommodations, advantages, facilities, privileges, or services; (2) Disability was a motivating factor for this denial; (3) Defendants' wrongful conduct caused plaintiff to suffer injury, damage, loss or harm.

193.    A student who is subjected to a hostile educational environment is deprived of some of the advantages and privileges of a public education.

194.    In this matter M.F. was subjected to a hostile, abusive and dangerous educational environment and thereby was deprived of the advantages of a public education.

195.    Defendants intentionally denied advantages, privileges and services, because of plaintiff's disability.

196.    Defendants intentionally discriminated against M.F. based upon disability by failing to provide M.F. with effective interventions, he was bullied and harassed by staff, repeatedly restrained, thrown over fences and against walls.

197.    M.F. was harmed in that he became physically traumatized, reactive to touching, exacerbated his condition, missed school, and was excluded from participating in learning.

198.    M.F.'s parents were denied information and denied equal protection of the laws solely based upon their heritage.

199.    The school district administration's inadequate investigation and response to M.F.'s continual restraint and physical harm was a denial of "advantages, facilities, privileges, or services" under Unruh.

200.    As a direct and proximate result of the Defendants' discrimination, M.F. has suffered severe and substantial damages.  These damages include litigation expenses including attorney fees, humiliation, embarrassment, inconvenience, exclusion, seclusion, mental and emotional anguish and distress, anxiety, fear and physical pain and other damages, in an amount to be determined by a jury and the Court.

201.    A violation of the ADA is, by statutory definition, a violation of both the Unruh Civil Rights Act ("Unruh") and the California Disabled Persons Act ("DPA"). Cal. Civ. Code §§ 51(f), 54.1(d). 170. Plaintiffs are not required to prove that the discrimination was intentional when seeking damages for ADA violations under the Unruh Act. Munson v. DelTaco, 46 Cal.4th 661 (2009).

## TENTH CAUSE OF ACTION

### VIOLATION OF CALIFORNIA ED CODE § 49001

### (AS AGAINST ALL DEFENDANTS)

202.    The foregoing facts and allegations are incorporated as if re-alleged herein.

203.    Education Code section 49000 provides: "The Legislature finds and declares that the protection against corporal punishment, which extends to other citizens in other walks of life, should include children while they are under the control of the public schools. Children of school age are at the most vulnerable and impressionable period of their lives and it is wholly

1    reasonable that the safeguards to the integrity and sanctity of their bodies should be, at this

2    tender age, at least equal to that afforded to other citizens."

3         204.    Education Code section 49001 interprets 'corporal punishment' to mean the

4    willful infliction of, or willfully causing the infliction of, physical pain on a pupil. California

5    Education Code 49001(b) prohibits any person engaged by a public school from inflicting

6    corporal punishment upon a pupil.

7         205.    Touching that is "unreasonable" and amounts to a "willful infliction of physical

8    pain," is unlawful.

9         206.    Defendants unreasonably and willfully inflicted M.F., a disabled minor, with

10    physical pain.

11         207.    Defendants willfully and forcefully, for the purpose of causing him pain, grabbed

12    M.F., yanked his limbs, forced him painfully into holds, held him and painfully restrained him

13    using unauthorized methods.

14         208.    As a direct and proximate result of the Defendants' discrimination, M.F. has

15    suffered severe and substantial damages.  These damages include humiliation, embarrassment,

16    inconvenience, exclusion, seclusion, mental and emotional anguish and distress, anxiety, fear and

17    physical pain and other damages, in an amount to be determined by a jury and the Court.

18    **ELEVENTH CAUSE OF ACTION**

19    **BATTERY**

20    **(AS AGAINST ALL DEFENDANTS)**

21         209.    The foregoing facts and allegations are incorporated as if re-alleged herein.

22         210.    A defendant is subject to liability to another for battery if : he acts intending to

23    cause a harmful or offensive contact with the person of the other, or an imminent apprehension

24    of such a contact, and a harmful contact with the person of the other directly or indirectly results.

25         211.    In this matter Defendants intended to cause offensive contact with Plaintiff M.F.

26    as a way to force him to comply with behavioral rules.  That contact did take place over several

27    years and caused repeated harm to M.F.

28         212.    Defendant Ms. Ms. Dalton-Sausedo intentionally threw him up against a wall.

213.    Defendant Mr. Dorsey intentionally threw him over fence.

214.    As a direct and proximate result of the Defendants' abuse, M.F. has suffered severe and substantial damages.  These damages include embarrassment, humiliation, mental and emotional anguish and distress, anxiety, fear and physical pain and other damages, in an amount to be determined by a jury and the Court.

**TWELFTH CAUSE OF ACTION**

**ASSAULT**

**(As Against All Defendants)**

215.    The foregoing facts and allegations are incorporated as if re-alleged herein.

216.    Defendants demonstrated the unlawful intent to inflict imminent apprehension of immediate injury by these acts. The actions were unlawful because the use of restraints or holds was not in accordance with provisions of the California Education Code.

217.    California Government Code § 815.2 states that a public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his or her employment.

218.    HUSD, is a public agency, and was at all relevant times the employer of defendants Defendant's.

219.    SENECA is private entity agency contracted by HUSD. Seneca, a private entity was at all relevant times contracted with HUSD to provide services to its students.

220.    All instances of intent to inflict immediate injury occurred within the scope of defendants' employment.

Wherefore, Plaintiff requests relief as set forth below.

**JURY DEMAND**

Plaintiff(s) hereby demands that this matter by tried to a jury. PLAINTIFFS request a jury trial on all causes of action pursuant to FRCP §38 (b

**PRAYER**

Wherefore, Plaintiff(s) prays for relief as follows:

PLAINTIFF'S COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1. General damages in an amount to be determined at the time of trial;

2. Special damages in an amount to be determined at the time of trial;

3. Punitive and exemplary damages;

4. Attorney's fees and costs;

5. Pre-judgment interest;

6. Any and all such other relief as the Court deems just and proper.


Dated: November 2, 2016                           Respectfully submitted,

                                                  TOLLNER LAW OFFICES


                                          By      _ /s/__David H. Tollner_____
                                                  David H. Tollner
                                                  Attorney for Plaintiff(s)
                                                  M.F.., a Minor by and through his Parents,
                                                  and Guardians ad Litem, MAGDY FARRAJ
                                                  (father) and STEPHANIE FARRAJ
                                                  (mother); MAGDY FARRAJ individually;
                                                  and STEPHANIE FARRAJ, individually